Okay, this one's Diamond Vapor versus the FDA. Mr. Navar. Thank you, Chief Judge and judges of the court for your time today. Jared Navar for petitioners here in these consolidated cases. May it please the court, as you know from reading the briefs, we've made the argument that FDA's denials here of my client's applications were arbitrary and capricious and contrary to law. We've got a, you know, fair notice argument as well as a statutory argument. And to start with fair notice first, the denials were arbitrary and capricious for lack of fair notice of the evidentiary standard that FDA expected our clients to meet with these applications. And I'm going to, a lot of this was just discussed in the prior case, but there's . . . There'll be a lot of that this morning, I think. Right. But I'd like to go through a few points because there are some relevant distinctions that I believe make our cases materially even different than Biddy's case in at least one respect. And also, I'll highlight some parts of the record that I think are important with regard to the fair notice argument we have. So first, as you know, in administrative law, it's a fundamental principle. Fair notice is a fundamental principle. You have to have prior notice of the standard you're supposed to meet so that you can, you know, spend your money wisely, do what the agency expects you to do. I believe the record is clear here that we were not provided fair notice of the evidentiary standard that FDA ultimately retroactively actually announced in these denial orders for the Now that we have the administrative record, we know that this fatal flaw memo from July 2021, that's the first place anywhere in this record that this specific comparison . . . And the problem is, just to make this very clear, the FDA . . . I'm not just arguing that the FDA violated fair notice because they came back and said that they just need an RCT or a longitudinal cohort study. I recognize that they're saying now, I believe it's a cursory statement, but they are saying, well, we would review other evidence as well. The point I'm focusing on is that, what is the substantive standard that they're reviewing the evidence, whatever evidence they review, to try to meet? It seems to me from reviewing this, maybe I misunderstood, but I thought they were saying, look, it's clearly been shown by the evidence that flavors are causing kids to start using ENDS products and therefore make them more likely to smoke. What's not clear, what there are mixed results on, is whether flavors, in comparison to tobacco flavor and possibly menthol flavor, provide any advantage to current smokers of primarily switching to ENDS products or quitting. That's what I'm understanding that they are saying, that the studies are mixed and you can't say clearly whether there's an advantage of flavors over tobacco flavors or menthol flavors, such that it would warrant authorizing the sale of flavors if the other products can do the same thing. Am I misunderstanding that in some way? And if I'm not misunderstanding it, why isn't that, what is arbitrary and capricious about that? Well, no, and thank you for the question. This gets right to the heart of the question. I want to emphasize what is the very limited nature of the argument we can even make here. We're not saying, it's very clear that the FDA has discretion to decide what, you know, the statute sets out this very capacious standard appropriate for the protection of the public health. What that means, nobody knows until the FDA says what it means. And that's the issue. So what have they said that it means? So to your question, if they want to decide that we're going to specifically weigh, you know, we're looking at this product or these types of products defined a certain way, if there's evidence of a youth uptake is too high in relation to the benefit to adult smokers and cessation, I'm not saying they can't announce that standard. The problem here is that if you go another level of specificity, which they did to deny all these applications, they didn't just establish that standard. They said what's necessary to meet that standard is a specific comparison of this applicant's flavored products versus this applicant's tobacco flavored ends products. And that, I would submit to that. Did they give you notice of that comparative efficacy, um, before? No, and in fact... The application deadline? No, they didn't. The first place it appears in the record, and in my record it's in the appendix page 6910. That's a fatal flaw memo. That's where they first announced that standard. If you look at the memo, it's actually even clearer than, I mean, I don't know how it can make it any any clearer because the, that this is a new standard because the stat, the the memo itself says, this is 6910, the staff was quote tasked with developing a new plan. An FDA quote has determined unquote the evidence, and then they lay out the evidence here. First of all though, wasn't that retracted, that fatal flaw memo? Was that not retracted? It was not, and this is an important point. What what the FDA says was retracted was the, there's a long, there's a long memo which actually in point of fact is the basis, almost verbatim for all these TPL memos in the record, but what they've said they, if you look at the FDA's brief, I believe it's on page 46, but I can maybe do that on rebuttal. What they say was rescinded was this long memo where the, with this analysis about, about, you know, describing literature reviews and what's, what's permissible and what's not, but they did not retract the actual standard itself of requiring a comparison between your flavored products and your tobacco flavored products, and we know that because that's, that's the entire basis for the denial. If you look, let me ask you this, are you, let's assume, let's assume that they gave you all the notice that they needed to give you, just this is hypothetical, they gave you all the notice, but in order to, in order to grant the application, you would have to show a benefit in the form of more, more current smokers switching primarily to ENDS or quitting than youth beginning to take up ENDS products and or cigarettes as a result of the non-tobacco and non-menthol flavors such as, you know, candy, fruit, etc., mint. So they went through that, they went through all the process, they gave you all of the notice that you had to have, and they decided that, that they weren't going to, they were going to deny any applications where you didn't show substantial evidence that there was a benefit to current users versus the damage caused to youth, okay? Assuming that to be the case, is it your position that that would be an arbitrary and capricious decision? Well, in that, in that scenario, we, that, I could only make that argument based on what their analysis would be. I would say that the scenario you've just laid out, Your Honor, is, is the scenario that we expected under the guidance. In other words, they said... I'm asking you, let's assume that you got what you think was required notice, they reviewed all the materials, and they concluded that you did not have evidence that showed that there were more adult smokers that were going to benefit from this, from flavors as opposed to tobacco and menthol flavors, than youth who were going to start smoking as a result of your products. Assume that's the hypothetical. Would that be arbitrary and capricious? Would that not satisfy the standard of appropriate, of not, of a determination that your product was not appropriate for the promotion of the public health? I could not say that that would be arbitrary and capricious. Okay, so your problem with this is that you are concerned about the process. Is that fair to say? With, and specifically with this, with the specific evidentiary standard. And what, what specifically about the evidentiary standard? So, if I could just point you to, I think this, this, there's a footnote, I mean, this statement is all throughout the FDA's brief, but I think in the footnote, page 50, note 18, really illustrates this maybe in the best way because the FDA basically waves off all of our evidence. In this footnote, they're talking about, so the quote, you know, they quote our brief where they say, well, you know, petitioners argue that their, their applications contain many randomized controlled trials in the form of abuse liability studies that included data, you know, on user behavior, etc. And then they, the FDA says, but they do not contend that the studies or any other materials in their applications provided robust and reliable evidence demonstrating that, and this is the problem, petitioner's products have an added benefit over a comparable tobacco flavored product. That standard was never articulated anywhere. Okay, if that standard had been articulated and they made that decision, would you think that there was something arbitrary and capricious about it? Well, as a general matter, no. But the point we would, what we're asking for is if this is the standard, and, and we have other arguments where I believe that actually they need to amend the rule if this is the actual standard, but if this is the standard, all we're saying is, all we can say is that we need time to, to try to meet it. And, you know, there's, there's specific parts of the guidance where if you look at, so back to where I kind of started with, you know, showing that the lack of notice, one, one way we know there's lack of notice, there, this evidentiary standard I just went through was never in the guidance itself. In fact, the guidance, as I argue in the brief, told applicants affirmatively, you have discretion to choose comparison products. Now, I mean, that could present other problems for us. It's hard to, it's sort of an open-ended question, but. Can I ask you a question, though, about that? I mean, you would agree that, that there's sort of been a recent, and by recent I mean within the last five to ten years, explosion of the use of ENDS products that did not previously exist, right? Would you agree? Certain types of products, yes. Yes, and, and as a result of that, the FDA has focused its enforcement efforts in different places, like where it thought the problem was initially, right? For example, on non-disposable products, and then when, first it focused on the sale, the sales and marketing, right? It sent out thousands of letters to manufacturers and retailers and asked for marketing plans to help with a problem of youth use, right? That didn't work. So after that, it focused on the candy and mint and fruit flavors, and it, and in particular noted that kids were using non-disposable types of products. So it went after those. But then, after use of that stopped a little bit, not completely, but changed, then the youth use moved to products that there was no enforcement against, right? It was, it I'm saying incorrect? No, that's correct. Okay, so why is it not fair for the FDA to, as it said in its various guidance, that it, you know, it's useful, its review of these products was evolving and it was responding to things that it didn't know at that time or whatever. Why is it not fair for it to require studies that it didn't specify exactly previously when it did say that there might be other things that develop and you still have to show, for example, you must be able to determine the likely health risks of the, the FDA must be able to determine the likely health risks of the new tobacco product. And while the rule does not necessarily require you to conduct new studies, the FDA expects that it could not issue a marketing granted order unless the application contains data from a variety of sources, including both clinical and non-clinical investigations, that give the FDA comprehensive information about the products likely health effects in the U.S. market. Why couldn't it determine, consistent with what it said in this guidance, that now what is determined in light of the changing nature of youth use would be these kinds of studies? Well, for one, I mean on the general question, again, there's a fair, there's a fair notice problem. If by these types of studies you mean the study with the specific comparison that I'm objecting to, I think that would be a problem because of lack of fair notice. If, if I'm not... I guess what I'm asking though about that is what, what is the FDA, what does the FDA have to do if it, if a problem evolves as a result of other enforcement? It's sort of like a water balloon, right? You have a water balloon, you squeeze it in one place and all the water pops to another place. Well, you know, moves to another place and it bulges somewhere else. And so the FDA is constantly going after different places where it's, you know, it's made enforcement efforts, the problem moves somewhere else, it goes after that enforcement problem, but it doesn't know at the time that it goes after the first one that the problem is going to move someplace else. And so it says what it thinks it's going to need to do and need to show, but it says, look, we're telling you this is what we're looking at now, but this could change, we might need something more in view of the evolving use of youth, of youth ENDS products. What else does it need to do? I mean, are you saying it has to predict the future or would it be better off if it just said, we can't tell you what we need, you know, you're just going to have to, we can't tell you specifically, we are telling you generally that what you need is enough to convince us that, you know, the likely good from these flavored products is going to outweigh the likely harm to youth. I mean, what is it that you envision that FDA had to do in light of the changing circumstances and the effects of its enforcement on, you know, different aspects of this problem? Okay, that's a fair question, and the answer is simple, and it's provided for in the brief. It's to reasonably explain why, despite the fact that in the past they made, all throughout the record in various ways which I can cite, and we have cited in the brief, they've made these distinction between open tank systems on the one hand, and pods first, and then youth migrated to disposables. So all the FDA has to do, which is not a hard task if the facts are there, is to reasonably explain why their concerns now extend to these risks in terms of youth appeal, but they didn't try to do that. But didn't, I mean, it seems like they kind of did, right? They said, we enforced it here, and we took these products off the market, they weren't available anymore, so then youth went to these other products. Why isn't that a reasonable explanation? Because I think if you read the FDA's brief closely, they do a very good job of alighting exactly that point. They say that youth migrated from pods and systems to disposables, and then they take that to make this leap to say that, well, youth migrate from one type to another type, so flavors are, you know, are the driving factor across all device types. But the problem with that is, as we made in the brief, is that, and the FDA reiterates in their brief, that there are certain quote-unquote features of device types that appeal to youth, and that's that they're easy to use, and they're discrete, because they can stick them in their backpack or stick them in their pocket and take them to school, for example. You can't do that with an open-tank contraption, as the FDA commissioner, the former commissioner, called them, and so the fact that youth migrated from one discrete and easy-to-use type of system to another discrete and easy-to-use type of system does not mean you can just, you know, take a hammer to a different type of system without even explaining any data that supports that change. So they could do that if they could support it, but they haven't tried to support it. Let me ask you a quick question about your marketing plan. So the FDA included the footnote in your denial letter, too, that just said we don't care about your marketing plan. Am I right about that? That's correct. Okay, is there anything, counsel for Biddy argued that they had, you know, their plan was to not market online, etc. Is there anything about your marketing plan that is unusual or unique or that the FDA should have considered besides the fact that it existed? Well, I've reviewed them, your honor. Every one is somewhat different. A lot of the applications, you know, state similar things. Virtually all of them are doing, you know, age-gated, if they have a website at all, they're doing, you know, verification measures sometimes through third parties. They have very robust processes, you know, face-to-face scanning IDs when you're in the store. They're all different in some respects. We'd have to look at the records specifically to look at those, but my, so I believe there are. The problem is with the FDA's position, and we said this in the brief, and the FDA hasn't responded to it, we pointed out the sample TPL memo, which became the basis for all these other memos that all my clients got at least, all the other ones that I'm aware of, they all say the same thing. They all have that same footnote. So it's unclear when, if ever, the FDA actually reviewed anybody's marketing plan. We said that in our opening brief, and the FDA hasn't, you know, pointed to any place where they actually did. Okay, my time is up, so. Okay, you've saved a few minutes. Mr. Cowan. Good morning, Your Honors. May it please the Court, Zach Cowan for the government. Your Honor, as I've heard the arguments up to this point, I understand that there's essentially three questions that the Court is really concerned with, and I hope to address them all in turn. Counsel, I'm sorry. Would you mind just pulling the microphone up a little bit? Thank you so much. Yes, Your Honor. Of course. The first, I understand that the Court is concerned about whether, the extent to which FDA reviewed the evidence. The second is the extent of which there was fair notice of the comparator requirement. And the third issue that was just raised in particular for this case is the extent to which there's some difference for the open tank system products. So if the Court would have it, I would address those questions. There's also the problem of the administration perhaps failing to acknowledge that it had changed its policy and had not given a reasoned explanation for it. The notice problem, it seems that the administration really applied a new standard that was inconsistent with all of its previous statements. Then it didn't, the second problem is that it didn't consider the actual evidence submitted. And then, and the third problem is that it seems to not even acknowledge that it has changed its policy and then failed to give a reasoned explanation for that. Absolutely, Your Honor. I'll address those in turn. I'll start with the evidence itself in this case. Like the petitioner in Bitty Vapor, petitioners in this case sell flavored e-liquid products which are especially appealing to youth and they come in the form in this case of products such as Wacky Watermelon and Fruity Cereal. FDA reviewed the literature as a whole and found a scientific consensus that these products were posing a risk to youth. So it looked for any evidence of a benefit, any strong evidence of a benefit that would outweigh that risk. Now petitioners in this case submitted essentially two types of evidence. They submitted literature reviews and they submitted cross-sectional surveys. FDA explained why neither of those types of evidence would be sufficient to make the strong evidentiary showing that was required under the facts of working with these flavored e-cigarette products. First, I would point the Court to the surveys themselves. Generally, FDA explained at A638 as one example that these surveys are insufficient because they are point-in-time surveys that don't look at behavior over time. Second, they assess preferences rather than looking at the behavior itself. Now, that's a general assessment that FDA made for all of these sort of surveys that petitioners submitted, but it also made a couple points as to Johnny Copper's survey as well. It noted, for example, that the surveys were not product-specific or if they were, it didn't explain to the extent to which they were. And it also indicated there was little information on the methodology that was used to conduct the surveys themselves. Turning to the literature, Your Honor, FDA looked for any benefit to an adult and they found that the literature was mixed on whether there was any benefit. The evidence actually submitted by the petitioners in this case was exactly the same. One of the literature reviews that they relied on specifically said that there was a gap in the literature and that more evidence was going to be needed to determine whether there were any benefits. We discussed that extensively in our brief. Your Honor, FDA made clear at the final pages of the decisional memorandum that it reviewed for any robust evidence. It explained why that evidence wasn't sufficient, the literature reviews and the surveys presented, and finding no other evidence, it denied the applications, no other evidence of a benefit. I do think FDA has reviewed the evidence here for that benefit as it explained it did. Your Honor. Well, if some of the evidence that was submitted was marketing evidence, that they're restricting their marketing in a way that would reduce the risk of youth using these, wouldn't you have to consider that? Your Honor, as I see it, the way FDA's analysis works is it first found that there's a substantial risk to youth from these products and there's little evidence and no strong evidence of a benefit to adults. Now, FDA's determination on this record is that difference couldn't be made up just by the marketing plan, the advertising restrictions in itself. Without looking at it? Yes, Your Honor, and I would say if you look to the 2020 guidance, it's very clear that FDA's looked at these exact type of restrictions that are being proposed here. For example, restricting access to the online stores, restricting access to going into the stores, and in terms of the marketing plan, the advertising restrictions, those are also very similar in terms of what FDA looked at in the 2020 guidance, you know, looking to whether they're using kid-friendly packaging, how they're marketing online. FDA said all of that was insufficient, and if you look to, I'm going to give you the exact quote, Your Honor, so that you can see it. Essentially, these restrictions were not sufficient to address youth use of the products, and the reality is that youth have continued to have access to INS products in the face of these legal prohibitions, and even after voluntary actions by some manufacturers, and I would point the court to look at these, that you could look at page 8 of the 2020 guidance, page 21 of the 2020 guidance, and page 44 of the 2020 guidance to see how FDA weighed that evidence. It reapplied that experience when it was considering the decisional memorandum, and once again emphasized that it wasn't aware of any access restrictions to date that had been sufficient to mitigate that risk. And here's just a follow-up on Judge Pryor's question. I mean, here's the issue I have with the marketing is, how do you know that if you don't look at the evidence? I mean, it seems comparable to me like if I were a judge saying, you know what, I just don't care what a criminal defendant says. What they say doesn't matter. I'm just going to sentence them regardless of what they say. How do I know it doesn't matter unless I listen to what they say, right? Absolutely, Your Honor, and I'd make two points on that. And the first is just to say that it's clear that these restrictions in this particular case are no different than those at FDA, or not materially different, and the petitioner hasn't contended otherwise that they're materially different than any FDA has already considered. But to the second point, you know, this is an iterative process with these applications, and you've seen the letters in the records show it. I mean, I think that's a good point. I guess, is that what the FDA said, though? I mean, when I look at the footnote, it seems like they're not saying, we looked at these, they're comparable to the ones that we've seen before. Instead, they're saying, we didn't look at them, we don't care what they say. Well, it said that these sales access restrictions, it wasn't aware to date of any sales access and advertising restrictions that have been sufficient. Now, there are other types of restrictions. We alluded to this in our brief, such as device access restrictions would physically restrict the device. Now, petitioners who presented those sorts of restrictions, they made the FDA aware, outside of the marketing plan itself, of the existence of these restrictions. And FDA, in those applications, to my knowledge, are still undergoing further review. But those restrictions aren't present in this case. And those are restrictions where, you know, literally only an adult can use the device. Something along those lines, Your Honor. I mean, at least for the one we cited that was publicly available, yes. Unless Your Honor has any more questions about this particular aspect, I'll move on to the comparative analysis itself. You know, petitioner takes, all the petitioners so far have taken exception to the idea that it wasn't clear that there was supposed to be some comparative analysis. But Your Honor, I would point you to two places that I think it's very clear that you have to compare your product to other products, including some of that guidance specifically discussing flavored products itself. The first, I'd point you to the 2019 guidance. And if you look, my friend earlier mentioned one quotation, I'd give you a second one as well. First, if you look to page 13 and 14, which is the one my friend cited earlier, it said that you needed to look to the, you know, compare your product to products within the same category and subcategory and then different categories. But if you then go on and look as well at pages 43 and 44 of the 2019 guidance, there's a specific discussion about flavored e-liquid products. And FDA is really clear that they, that petitioners need to assess the impact of flavors on appeal to youth. And it goes on to even say that you should assess, quote, whether the new tobacco product presents less risk than other tobacco products. So I think those two, those three quotations together in conjunction give petitioners fairly good notice. But then if you take another step and just look at the Tobacco Control Act itself, which is very clear, it's subsection B1A, that an application shall contain the evidence of risks and whether a product presents less risk than other tobacco products. Now, FDA engaged in adjudication in this case. Petitioners are effectively asserting that the Tobacco Control Act prohibits FDA from considering that there is another similar product, which is a tobacco flavored e-cigarette product, which presents similar benefits to adults in terms of smoking cessation and reduction, but less risks to youth. And they're saying that FDA has to ignore that under the statute. That seems to contort the statute itself, flips the statutory burden on its head of saying FDA has to outline exactly the sort of evidence that could be sufficient. And, you know, given that and the 2019 guidance together, Your Honors, I would say that it's very clear that petitioners had to notice that they had to make the appropriate comparisons, and they failed to do so here. Now, Your Honor, I guess the third issue I would raise is the open tank issue as well. Petitioners have made much about the fact that the discussion of youth moving from cartridge-based products to disposable products didn't in any way discuss the open system ends. But FDA had a second finding that together got it to the place where it said that youth usage is fluid. It specifically noted that the role of flavors in appealing to youth is consistent across devices. Now, it goes and looks at a survey, and it specifically found that 76% of youth prefer open products, and 81.7% prefer fruit-flavored e-cigarette products as their preferred e-cigarette product. So I think you have to look at those two findings in conjunction, the one, the move after the 2020 guidance, and the second one, that the role of flavors persisting across devices by looking at that descriptive evidence to get the whole showing there. Your Honor, I understand that you had one question. I don't recall it off the top of my head. The problem was whether you had failed to acknowledge that you were changing your policy and provided a reasonable explanation for it. Yes, Your Honor. As to the comparator analysis . . . A reasoned explanation. I guess that argument has been made in several different contexts. One is the comparator, and I think we've talked about that a little bit. But I could also just look to the question of what sort of studies are provided. I want to make clear that the 2019 guidance was also clear on that point. I'm sorry to interrupt you. Just so I'm understanding your answer to Judge Pryor's question. Are you saying that it wasn't a change in your position that you had always indicated that you were going to be looking for comparison of non-flavored products or tobacco flavored to other flavors? Your Honor, I would say that I think the 2019 guidance put petitioners on notice as well as the Tobacco Control Act itself. Okay. And the reason I ask you that is because Chief Judge Pryor was asking not just that, but if you did change your position, where is the reasoned consideration? What would you point to to explain it? So your position is that you didn't change your position. There was always notice. Yes, Your Honor. Did you also want to address whether . . . I guess so. You didn't need to offer any reasoned consideration, but did you also want to address any explanation? Yeah. Your Honor, I would say to the extent we don't think there was any consistency whatsoever, but it is worth noting that these are adjudications and FDA had to look at the evidence in front of it to determine whether that benefit was known. At the time of the 2019 guidance, FDA was very clear that its views could change based on what the evidence in particular cases showed. That guidance was very . . . it was applied to a general and large category of products, and the particular products in this case before the FDA, FDA had to look at the evidence in this case. So the adjudication had to be based on the particular evidence here. So that's why FDA required the showing, the product-specific showing here. It's because it found that the evidence was mixed on the benefits to flavor. So I hope that answers the Court's question on that point. I have one final question. So there's the fatal flaw memo, and opposing counsel argued that your recension of the fatal flaw memo was not thorough enough, I guess, is what his position was. Could you just respond to that? Absolutely. Your Honor, I would make two points on that. So there was that original memo that suggested that they would look for longitudinal cohort surveys or randomized controlled trial. Then there was a second memorandum that was, I think it was August 17th. Actually, that's right. It's A6923 note, Roman numeral 9. FDA was very clear there that it would consider other evidence as well. Ultimately, the decisional memorandum itself makes clear that FDA looked for other evidence. And so I don't see any reason not to take FDA at its word when it said it looked for other evidence. And as my colleagues already told you, there are other examples that the 2019 guidance gives of other evidence. For example, rather than randomly having a control assigned, you could use historical data or literature to potentially create a control. So that's at least one example of other evidence that could be sufficient. No further questions from the Court? We would ask that you would deny the petition. Thank you, Mr. Cowan. Mr. Navarro, three minutes. Okay. I'll try to hit a few points in my three minutes here. First, picking up the last point first. As I've said, I think we're kind of talking past each other on terms of what was rescinded and what was not. As I said earlier, counsel hasn't disputed this. The fatal flaw memo was rescinded in that the FDA came back and said, well, we don't just need an RCT or longitudinal cohort study. We'll look at, quote, unquote, other evidence, such as a literature review. The problem is that the part of the fatal flaw memo announcing this new standard of requiring this specific comparison to a tobacco flavor product, that clearly made it through to the final review. And that was the basis for every denial in this case. And just picking one, you know, the lead petitioner here, Diamond Vapors Appendix 640. This is the same in all the petitioner's, you know, corresponding documents have the same statements verbatim. But if you look at page 640 of the appendix, the scope of review section of the TPL report, the scientific review summary, and the conclusion, all on the same page, all say that this was reviewed to determine the presence or absence of a comparison with a tobacco flavored product. And that's why it was denied. So, with respect to the argument over the marketing plans, for one, there, you know, I wasn't able to summarize everything that's in the multiple pages that each petitioner submitted to the FDA. It's in the record and most of it's in the appendix as well. But to the extent the FDA now, they've admitted in the TPL report that they never looked at it. So, they can't post hoc come back and say there are deficiencies with it and they haven't pointed us to anything that's novel. We didn't have that, we did potentially in the record, but we can't. Let me ask you then about that. What would you point to that was in your marketing plan that was different from what you knew from past guidance and other activity of the FDA? The FDA had not already considered in other cases and realized wasn't enough to stop the youth problem and so it switched over to also enforcement actions against actual products themselves. Well, so for in Vapor Unlimited's application, I think they talk about certain, they're using certain law enforcement databases and trying to, track through time whether people who buy their products turn up to have given them to minors later, that sort of technology exists. I'm not sure that they're the only one that mentioned that. Again, every petitioner has at least six, eight, ten pages describing their marketing plans, training programs. Right, but the burden is on you to show that this is appropriate for the promotion of the public health. And so the question is, FDA has already announced, like repeatedly in the guidance, look, we tried this. We asked for volunteering by the companies to deal with the marketing problem. We tried it. It's not enough. It's not stopping youth use. We have an epidemic problem with it. So we have to move to enforcement actions against the products themselves. These are the things we tried. So my question for you is, what can you point to in your plans, your marketing plans, that is not substantially similar to the things that the FDA had previously tried and that had not worked? Well, so two, two basic responses, Your Honor. First, it's hard to answer that question with what's in the record because the FDA has just said, they haven't said what has been reviewed and found to be insufficient. They just said, we haven't found anything that's, that's sufficed yet. And so we're not reading your marketing plan. So I can't really make that comparison. But second, there, and this goes to sort of the second prong of our arbitrary and capricious argument based on the different device types here, open tank versus disposable and cartridge. The FDA is applying this extremely heightened level of review, which is clear in the brief. Every time they state the standard, they justify it based on this. They repeat the phrase, you know, this demonstrated threat to youth. Well, that doesn't apply. If that applies to disposables and cartridges, so be it. It doesn't, the FDA has not shown why it applies to open tank systems. So the whole, the whole standard of review is. I mean, I do recall reading in, and I'm sorry, I can't remember which guidance it was or which particular application, but I do recall reading the FDA saying that, that although originally they thought it was a problem with the cartridges, they realized that it extended across all flavor ends products. Does it not say that? Did I, am I misremembering? Maybe I am. No, they make a statement like that, but it's. So why doesn't that, why doesn't that talk about the open systems that you're discussing? Well, because the, if you read the brief just on its face, it's very cleverly phrased to try to avoid this distinction. It says they make the general conclusion that this threat to youth applies across device types. That's their concluding sentence in the paragraph. I'm not talking about the brief. I'm talking about it was either in the guidance or a TPL. I think it was in the guidance. And I apologize, I can't tell you specifically which one off the top of my head, but that it talked about the fact that although they originally started, they thought it was originally just with the cartridge products. When they started enforcing against those products, it moved to the disposable products and that they're now, they're concerned because of their enforcement that it keeps moving to just across the flavored products. The problem is with flavors, regardless of how they're packaged, the product is, the problem is with the flavored products. Does it not say that in the guidance? It says it in the, in the guidance where they talk about why they're now applying it to cartridges, I mean, to disposables, where it started with pods and cartridges. Then they said, well, youth migrated by a thousand percent to these new disposable systems, like the Puff Bar, like in the Wall Street Journal article that they cited in their 28-J letter. That's true, but my point still remains. So they try to take, they use the fact that youth migrated from one to try to make the general point that it applies to all products and that's, that's not substantiated in the record. Maybe they can substantiate it, but what my point is, the agency has to do that. That's under Encino, if you, Encino Motor Cars, Supreme Court. You can't, you can't ignore relevant material distinctions that you, you have earlier in the process recognized without at least explaining it reasonably. They can, they can change their I think, I think we understand your case, counsel. We've gone significantly over, but you've been answering questions from the court. So let's move to the last one, please.